# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td></td><td>100 EAST FIFTH STREET, ROOM 540</td><td></td></tr>
<tr><td>Deborah S. Hunt</td><td>POTTER STEWART U.S. COURTHOUSE</td><td>Tel. (513) 564-7000</td></tr>
<tr><td>Clerk</td><td>CINCINNATI, OHIO 45202-3988</td><td>www.ca6.uscourts.gov</td></tr>
</table>

Filed:  January 31, 2022

Ms. Mary Harrington
University of Michigan Law School
Federal Appellate Litigation Clinic
Law Student
Ann Arbor, MI 48109

Mr. Roy Kranz
Office of the U.S. Attorney
101 First Street
Suite 200
Bay City, MI 48708

Ms. Veronica Portillo-Heap
University of Michigan Law School
Federal Appellate Litigation Clinic
Law Student
Ann Arbor, MI 48109

Ms. Melissa M. Salinas
Federal Appellate Litigation Clinic
701 S. State Street
2058 Jeffries Hall
Ann Arbor, MI 48109

Ms. Erin S. Shaw
U.S. Department of Justice
211 W. Fort Street
Suite 2001
Detroit, MI 48226

Mr. Timothy Michael Turkelson
Office of the U.S. Attorney
600 Church Street
Suite 210
Flint, MI 48502

Re:  Case No. 19-2418, *USA v. Michael Johnson*
Originating Case No. : 1:18-cr-20794-1

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Ms. Kinikia D. Essix

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0017p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

┐
│
│  No. 19-2418
*v.*                                              │
│
MICHAEL LEE JOHNSON,                              │

*Defendant-Appellant.*
┘

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 1:18-cr-20794-1—Thomas L. Ludington, District Judge.

Argued: July 21, 2021

Decided and Filed: January 31, 2022

Before: SILER, MOORE, and DONALD, Circuit Judges.

———————

**COUNSEL**

**ARGUED:** Melissa M. Salinas, Veronica Portillo-Heap, UNIVERSITY OF MICHIGAN LAW SCHOOL, Ann Arbor, Michigan, for Appellant. Erin S. Shaw, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** Melissa M. Salinas, Veronica Portillo-Heap, Mary Harrington, UNIVERSITY OF MICHIGAN LAW SCHOOL, Ann Arbor, Michigan, for Appellant. Erin S. Shaw, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

DONALD, J., delivered the opinion of the court in which MOORE, J., joined. SILER, J. (pp. 26–27), delivered a separate dissenting opinion.

———————————

### OPINION

———————————

BERNICE BOUIE DONALD, Circuit Judge.   Michael Lee Johnson was indicted for unlawful imprisonment, assault of a domestic partner by strangulation and suffocation, interstate domestic violence, witness tampering, and assault, in violation of 18 U.S.C. §§ 13, 113(a)(8), 113(a)(4), 2261(a), and 1512(b).   A jury found Johnson guilty on all counts, and he was sentenced to 864 months' imprisonment, followed by four years of supervised release.   Johnson now challenges his conviction and sentence.   For the reasons set forth below, we **REVERSE** and **REMAND**.

### I.

Michael Lee Johnson dated C.J., a Native American, and a member of the Saginaw Chippewa Indian Tribe in Mt. Pleasant, Michigan.   They started dating in March 2018, and moved in together into an apartment in Mt. Pleasant, in September 2018.   The apartment was on the Isabella Indian Reservation in Indian Country.

On October 23, 2018, Johnson got into an argument with C.J. and would not let her leave the room.   Johnson then pushed C.J. on the bed and told her: "sit down, b****."   C.J. did not contact the police because Johnson told her he would throw her out the window if she tried. Around noon the next day, C.J. asked Johnson if he was still upset at her.   When C.J. was going to walk out the garage door, Johnson came behind her and slammed the door shut several times. Johnson proceeded to throw a bed that was in storage across the garage.   After C.J. left to work, Johnson messaged her on Facebook with derogatory messages.   C.J. then called Johnson's parole officer to inform her that she wanted Johnson out of her residence.

When C.J. returned home that evening, Johnson was standing in the kitchen, next to a knife on the counter.   When C.J. tried to walk him out of the house, Johnson came from behind, slammed C.J. into the wall, and jabbed her in the face with his finger.   When C.J. tried to yell, Johnson covered her mouth and nose with his hand, causing her to be unable to breathe.   Johnson

then wrapped his hands around her neck and slammed her down the stairs. C.J.'s neck was bruised, she hit her head on the stairs, and hit her arm on the marble banister.

Realizing that the only way for Johnson to leave was to drive him like he previously asked, C.J. got in the car, with her two minor children in the backseat, and drove Johnson while he yelled and screamed the entire way to Saginaw. Once in Saginaw, and still inside the car, Johnson grabbed C.J.'s head, pushing her head down towards the console. Johnson then slapped her across the face. C.J. went to the hospital to get x-rays of her injuries. Johnson was arrested the next day.

On November 28, 2018, Johnson was indicted for unlawful imprisonment (Count 1); assault of an intimate partner by strangulation (Count 2); assault of an intimate partner by suffocation (Count 3); interstate domestic violence (Count 4); 8 counts of witness tampering (Counts 5, 6, 7, 9, 10, 11, 12, 13); and assault by striking, beating, or wounding (Count 8).

Once in jail, Johnson tried to contact C.J. on several occasions, both via phone and mail. He sent her several letters, trying to convince her to drop the charges and not to testify against him. Eventually, C.J. filed for a personal protection order in February 2019.

The Federal Community Defender Office ("FDO") was appointed to represent Johnson on December 11, 2018. On February 1, 2019, Johnson sent his counsel a letter requesting that counsel no longer represent him because of his "overfamiliarization" with the Assistant U.S. Attorney ("AUSA"). Citing a breakdown in attorney-client relationship, his counsel moved the district court to withdraw on February 22, 2019. The district court held a hearing and granted the motion on March 12, 2019. The district court subsequently issued an order for appointment of new counsel.

On March 21, 2019, Johnson's new attorney, Barry Wolf, met with him to discuss the details of his case and a possible plea agreement. Wolf met with Johnson again on April 11, 2019, to inform Johnson that the government withdrew the original plea agreement but offered a new, less favorable one. During the meeting, Johnson became angry, began screaming, accused Wolf of working with the AUSA and left the room. Johnson then sent a hand-written motion to the district court, asking that Wolf be removed as his counsel.

On April 25, 2019, Wolf made another attempt to discuss the plea agreement with him. Again, Johnson became enraged and physically agitated and had to be restrained by three correction officers. Johnson did not wish to discuss trial strategy and continued to scream that he would not work with Wolf. Wolf, seeing that Johnson refused to discuss his case, citing a total breakdown of the attorney-client relationship, moved the district court to withdraw. The government filed a response, in which it took no position on Wolf's motion to withdraw, but requested the district court to explain to Johnson that if he proceeded with representing himself but continued to engage in disruptive or erratic behavior at trial, he could be removed from the courtroom. Johnson separately made an oral motion to proceed *pro se* on May 23, 2019. The district court granted Wolf's motion to withdraw. The district court then issued another order appointing the FDO, for pretrial consultation and as second chair during trial.

During the pre-trial conference, Johnson began by accusing the AUSA of "intimidat[ing] people's mother, kidnapping and extorting them so that he can induce a Rule 11 plea." Johnson's mother was, in fact, in custody for threatening the minor children of the victim. After much back and forth on the accusations, the district court asked Johnson how he wished to handle his defense. Johnson responded: "I'll represent myself. I can do a better job . . . ." When the district court asked Johnson why he thought that he could adequately represent himself at trial, Johnson admitted that "[i]t would be a David and Goliath, but [he was] willing to take that opportunity." After clarifying that his right to self-representation is "constitutionally protected . . . but [] not advisable," the district court explained that it would need to be clear as to who would be making the strategic decisions at trial, so that his counsel would not later be blamed for any inadequacies. Lastly, the district court asked Johnson if he understood that there would be "potential sentencing consequences, and that [Johnson was] potentially engaging in an area where [he didn't] have the expertise to evaluate all of the potential implications." Johnson replied: "I do, Your Honor." The district court concluded by informing Johnson that he would still have access to an attorney and the opportunity to review documents and evidence with their limited engagement. Johnson found this arrangement to be reasonable, and the district court then appointed a third counsel to assist Johnson during trial. In a separate order, issued a day after the hearing, the district court expressly stated that Johnson knowingly and voluntarily waived his right to counsel.

On July 8, 2019, Johnson filed a *pro se* motion for a bench trial. In the motion Johnson asked the court to waive a trial by jury. The district court denied the motion, citing the requirements for waiver: (1) in writing; (2) consent of the government attorney; (3) approval of waiver by the trial court; and (4) voluntary, knowing, and intelligent waiver. See *United States v. Martin*, 704 F.2d 267, 271 (6th Cir. 1983). Although the government consented to the waiver, the district court reasoned that jury trials are the constitutionally preferred method in criminal cases and denied his motion.

During voir dire on August 20, 2019, Johnson explained that he had a "slew of witnesses that [he] actually submitted to [his] co-counsel, however, to this point, [he was] unaware if they were subpoenaed or not." R. 100, Page ID # 663–64. The district court asked Johnson's standby counsel, Alan Crawford, if he had subpoenaed the witnesses, and Crawford explained that he had not. *Id.* Crawford admitted that he had received many letters from Johnson and had not had time to review all of them.

After opening arguments, the district court addressed the parties about any outstanding issues. Johnson's standby counsel again explained that he did not subpoena any witnesses that Johnson had mentioned on voir dire, and further stated that Johnson intended to call his mother, and that she was already included on the government's witness list. Crawford concluded that he would not be able to reach any other witnesses the day of trial. But Johnson insisted that he had provided the same witness list to Crawford and to his previous attorneys, and to the court, which were in sealed envelopes that the court returned to him. Johnson also stated that he had sent the witness lists to the district court and had "letters from [the] courtroom saying that [he was] trying to submit these lists."

The district court explained that Johnson would not be able to subpoena his witnesses to testify at his trial. The court further noted that Johnson's standby counsel confirmed that Johnson had not provided the list prior to that day and this was "consistent with the statements that have been made by prior counsel." The court weighed Johnson's statements against those of the three attorneys and concluded that Johnson was not making true statements about submitting a list to his previous attorneys and current attorney. The court did not look at any documents that Johnson claimed to have sent to the court.

During trial, when C.J. was testifying about her injuries, the government moved to admit photographs that the victim, C.J., had taken after the incident showing her injuries. Johnson tried to object to the nature of her injuries, and the district court asked Johnson whether he was making an objection to the admissibility of the evidence. Johnson did not object to the admissibility, stating rather that he "made [his] objection noted for the record." The district court overruled that objection as to the nature of the injury and admitted the photographic evidence.

The government also moved to admit screenshots of Facebook messages from Johnson's account which C.J. had taken just after the incidents. C.J. explained that she logged into Johnson's Facebook account so that she could remove photographs of her and her children from his account. She stated that no police officer or prosecutor instructed her to log into his Facebook account or to take the screenshots of his messages. Johnson then tried to object to the admission of screenshots of conversations on his Facebook account with others, claiming they were illegally obtained. Again, the district court overruled the objections and admitted the screenshots into evidence. The conversations Johnson had with others included self-incriminating statements. In one of the conversations, Johnson wrote: "I'm pretty sure I'm going to jail, brother. I f***** up. I put hands on. I choked her, slapped her." To another person, Johnson wrote: "I committed domestic violence. I've never done that. Can't go back. Someone made me that angry."

Johnson did not object to the admission of letters that he sent to C.J. from jail, saying that they were "just confrontational letters." After the government began going through the contents of the letters with C.J., Johnson raised an objection that the government was introducing misleading excerpts of the letters. The district court denied that objection, stating that the letters were already admitted. In the letters, Johnson expressed remorse for the injuries that he inflicted on C.J. and asked her not to pursue the federal charges.

Johnson cross-examined C.J. for about an hour and a half, during which he repeatedly attempted to testify. He also tried to introduce exhibits of Facebook messages and posts, and pictures of him with the victim. Johnson, however, did not provide an exhibit list or pre-marked defense exhibits, and repeatedly failed to lay a proper foundation and establish the relevance of

his intended evidence.  The district court called a recess and informed Johnson that he had fifteen minutes to complete cross-examination.

Shortly after he began questioning C.J. again, Johnson asked for his standby counsel to take over the cross-examination.  The district court denied Johnson's request, explaining to Johnson that he elected to represent himself, that Crawford was appointed as standby counsel, and that it was "not a circumstance where [he] [got] to play tag team."  Once Johnson confirmed that the government would be calling other witnesses, he agreed to allow Crawford to represent him for the remainder of the trial.

After the government presented witnesses, Johnson declared that he would be testifying, despite being warned by the district court that he would be subjected to cross-examination.  The district court noted that Johnson had a constitutional right to testify at his trial, warned him that the government would then cross-examine him, and explained that if he chose not to testify, the district court would provide the jury with instructions that they are not to hold that against him. Johnson insisted:  "110 percent I will take the stand.  I'm going to testify."

During the direct examination, Johnson's counsel asked if he could tell the jury about the events of October 23, 2018.  Johnson clarified that he had a verbal argument with C.J. but insisted that it was not physical.  Before Crawford could ask more questions, Johnson said "I never put my hands on her.  God knows this.  I never touched this woman.  I never threatened her.  I never held her against her will."  Johnson then stated:  "I've never . . . restrained a woman, kept them against their will.  I've never choked a woman."

On cross-examination, the government asked Johnson about his statements during the initial police interrogation.  Frustrated by the repeated questioning and inability to speak to the jury, Johnson became increasingly upset and yelled at the judge and his counsel.  The district court ordered that Johnson be removed from the courtroom.  Johnson had to observe the remainder of the day's proceedings via closed-circuit television.

The government asked the court to hear the testimony of two rebuttal witnesses, Johnson's former girlfriend and former spouse, who claimed that Johnson strangled one and held the other against her will.  Although the district court had initially denied the government's

motion to introduce the testimony of the two witnesses, the district court concluded that Johnson's testimony that he had never restrained or kept a woman against her will opened the door to such testimony for impeachment purposes.[1]   The following day, as part of the court's instructions, the district judge told the jury that it could consider the two rebuttal witnesses' testimony for impeachment purposes only:

> You've heard testimony from [R.T.] and [S.T.] that the defendant committed acts of strangulation, suffocation and/or false imprisonment other than the ones charged in the indictment.  If you find the defendant did those acts, you can consider the evidence only as it relates to the Government's claim to rebut the defendant's testimony that the defendant had not engaged in any such acts before. You must not consider it for any other purpose, including as a substitute for proof of the charged criminal offenses.  Remember that the defendant is on trial here only for the charges contained in the indictment, not for the other acts.  Do not return a guilty verdict unless the Government proves the crimes charged in the indictment beyond a reasonable doubt.

R. 103, Page ID # 1167–68.   Johnson's counsel did not offer any objections to the jury instructions.  *Id.* at 1184.

During his former girlfriend's testimony, Johnson was heard screaming from a separate room while in custody, which impacted the witness testifying.  Despite this behavior, the district court allowed Johnson to come back into the courtroom for closing arguments.  Johnson repeatedly interrupted the AUSA during closing arguments, pointed at the victim, stared down the jury and pointed fingers at them.  After reassuring the district court that he would not engage in any more erratic behavior, Johnson burst out yet again and had to be removed for the last time. On August 23, 2019, after a four-day trial, the jury found Johnson guilty on all counts.

The Presentence Report ("PSR") calculated Johnson's total offense level at 38 and his criminal history category as VI.  PSR ¶¶ 85, 96.  His final Guidelines range, factoring in the maximum penalties for his convictions, was 360 to 2412 months (30 to 201 years) of imprisonment.  *Id.* ¶ 117.

---

[1]The district judge observed, and Crawford agreed, that counsel had admonished Johnson that he should not testify about his behavior in other relationships to avoid opening the door to the rebuttal witnesses.

In Johnson's sentencing memorandum, Crawford did not object to the PSR's calculation of his offense level or criminal history category. R. 91 (Def.'s Sent. Mem. at 1). Johnson's counsel did describe the Guidelines range in Johnson's case as "exceptional," and noted that it far exceeded what Johnson would receive in the state system. *Id.* at 2. The sentencing memorandum asked that the district court not impose a life sentence. *Id.* Specifically, his counsel suggested that the "decades of consistent mental health treatment" that Johnson would receive during a substantial but less than life sentence offered the possibility of rehabilitation. *Id.* at 2–3.

At the sentencing hearing, Johnson indicated that he would proceed *pro se* with Crawford acting as standby counsel. Despite Johnson formally proceeding *pro se*, Johnson's counsel gave a substantial sentencing colloquy. Johnson's counsel acknowledged his client's belligerent behavior but asked the court to "show mercy," and to sentence Johnson to at most the 30-year bottom of the Guidelines range. Counsel further asked for a sentence below the recommended Guidelines range, urging the court to see the potential of reform in Johnson.

Johnson also addressed the court, asserting that there were violations of his Fourth, Fifth, Sixth and Fourteenth Amendment rights, but did not elaborate what the violations were. He maintained that he had not committed the offenses. Although the district court reminded Johnson that the purpose of the hearing was to determine his sentence, Johnson did not offer any arguments regarding his sentence. When C.J. gave her victim impact statement, Johnson repeatedly interrupted her to call her a "liar," "monster," and a "confidential informant." R. 104, Page ID # 1261–64. The government offered additional statements about Johnson continuing to call the victim and her mother after being convicted. C.J. asked that the court impose a life sentence, and the AUSA requested a 100-year sentence.

After the parties completed their arguments, the district court made only two comments about Johnson. First, the court noted: "you often appear to not be able to discern, as was explained earlier, what's in your best interest and what is not; and, as a result, you've ended up behaving in ways that didn't assist the presentation of your case." Second, the court stated that he could "not discern any sense of moral guardrails concerning your own behavior, none."

Based on Johnson's criminal history and career offender status, the court sentenced him to 864 months' imprisonment, followed by four years of supervised release. Johnson interrupted the district court's subsequent explanation of the conditions of his sentence and supervised release to declare that "[t]his is all staged," and cited an array of Supreme Court cases, while proclaiming his innocence. Visibly upset by the sentence, Johnson proceeded to tell everyone in the courtroom they would "burn in hell." Johnson timely appealed.

## II.

The Sixth Amendment affords the right to those accused in all criminal prosecutions to have the assistance of counsel for their defense. U.S. Const. amend. VI. At the same time, the Sixth Amendment grants the accused the right to make his own defense. "Although not stated in the Amendment in so many words, the right to self-representation—to make one's own defense personally—is thus necessarily implied by the structure of the Amendment." *Faretta v. California*, 422 U.S. 806, 819 (1975). The Supreme Court in *Faretta* cautioned that the defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Id.* at 835 (quoting *Adams v. U.S. ex rel. McCann*, 317 U.S. 269, 279 (1942)).

In *United States v. McBride*, 362 F.3d 360, 366 (6th Cir. 2004), we clarified that "[w]henever a district court in the Sixth Circuit is faced with an accused who wishes to represent himself, the court must ask the defendant a series of questions drawn from, or substantially similar to, the model inquiry set forth in the *Bench Book for United States District Judges.*" 362 F.3d at 366. The model inquiry in the *Bench Book* consists of thirteen questions and one final admonishment. *Id.* In that case, we concluded that the defendant had knowingly and voluntarily waived his right to counsel even when the district court failed to ask one of the thirteen questions because the twelve other questions, in conjunction with the other questions that the district court asked the defendant, "substantially complied with the essence of this inquiry." *Id.*; *see also United States v. Gooch*, 850 F.3d 285, 289 (6th Cir. 2017) ("In this circuit, district courts must conduct a colloquy akin to that in section 1.02 of the *Bench Book for United States District Judges*.").

As Johnson challenges the *Faretta* inquiry for the first time on appeal, we typically would review Johnson's claim for plain error. *See United States v. Olano*, 507 U.S. 725, 732 (1993). In *McBride*, we recognized that our precedent is unclear as to the proper standard of review for the validity of a waiver of the Sixth Amendment right to counsel. In some cases, we have applied plain-error review, *United States v. Modena*, 302 F.3d 626, 630 (6th Cir. 2002); *United States v. Herrera-Martinez*, 985 F.2d 298, 301 (6th Cir. 1993), whereas in other cases, we thoroughly reviewed the *Faretta* inquiry without specifying a standard of review, *United States v. Miller*, 910 F.2d 1321, 1324–25 (6th Cir. 1990). Since *McBride* recognized this ambiguity, we have sidestepped this conflict because the defendant's claim would fail under either plain error or *de novo* review. *See, e.g.*, *United States v. Tucci-Jarraf*, 939 F.3d 790, 794 (6th Cir. 2019); *United States v. Ross*, 703 F.3d 856, 866–67 (6th Cir. 2012); *United States v. Williams*, 641 F.3d 758, 766 (6th Cir. 2011).

Other circuits treat a defendant's unpreserved challenge to the waiver of the right to counsel like any other legal question and review *de novo*. *See, e.g.*, *United States v. Kimball*, 291 F.3d 726, 730 (11th Cir. 2002) (per curiam) ("A district court's conclusion that a defendant's waiver is valid—that it is knowing, voluntary, and intelligent—is a mixed question of law and fact that we review *de novo*."); *United States v. Turner*, 287 F.3d 980, 983 (10th Cir. 2002); *United States v. Hoskins*, 243 F.3d 407, 410 (7th Cir. 2001); *Holman v. Kemna*, 212 F.3d 413, 420 (8th Cir. 2000); *Lopez v. Thompson*, 202 F.3d 1110, 1116 (9th Cir. 2000) (en banc); *United States v. Cunningham*, 145 F.3d 1385, 1392 (D.C. Cir. 1998); *Virgin Islands v. Charles*, 72 F.3d 401, 404 (3d Cir. 1995); *United States v. Spencer*, 995 F.2d 10, 11 (2d Cir. 1993) (per curiam). The Fourth Circuit has also grappled with the proper standard of review for unpreserved challenges to the district court's *Faretta* inquiry. *Compare United States v. Bernard*, 708 F.3d 583, 588 (4th Cir. 2013) (reviewing for plain error when the defendant was represented by counsel at the *Faretta* inquiry and counsel advocated for the defendant's ability to represent himself), *with United States v. Ductan*, 800 F.3d 642, 648 (4th Cir. 2015) (reviewing *de novo* when a *pro se* defendant failed to object to the district court's determination that the defendant forfeited the right to counsel).

We find persuasive the reasoning of the Ninth Circuit in *United States v. Erskine*, 355 F.3d 1161 (9th Cir. 2004), in which the court determined that the *de novo* standard of review was appropriate for reviewing the district court's *Faretta* inquiry, rather than the plain error standard urged by the government. In *Erskine*, as in this case, the defendant challenged the district court's *Faretta* inquiry on appeal without having objected to the inquiry below. The court explained that *de novo* review was appropriate because the "requirements for reviewing the validity of a *Faretta* waiver are predicated on the fact that we do not expect pro se defendants to know the perils of self-representation," the court "cannot expect defendants to recognize that they have not been correctly and fully advised, let alone to point out the court's errors." *Id.* at 1166. It would be nonsensical to require that a prospective *pro se* defendant object to the district court's inquiry into the defendant's rationale and ability to proceeding *pro se*. To preserve the issue, defendants would have to recognize their own inability to represent themselves and object to their own request to proceed *pro se*.

It is true that Johnson's second counsel, Wolf, was present during the *Faretta* hearing, but he was not acting as Johnson's counsel during the hearing, but instead sought the district court's permission to withdraw as counsel. Johnson's case, then, is distinguishable from the Fourth Circuit's decision in *Bernard*, in which the court reviewed for plain error. In *Bernard*, the defendant's counsel was present at the *Faretta* inquiry and argued on behalf of the defendant's desire to represent himself. 708 F.3d at 586. Accordingly, because the standard of review impacts the outcome of the case, we join the other circuits to consider this issue and we review *de novo* the waiver of the right to counsel.

Johnson cites *Faretta* for the proposition that the district court should have held a formal colloquy to inform him "of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" 422 U.S. at 835 (citation omitted). Johnson asserts that the district court's failure to ask Johnson a series of questions, such as those listed in the *Bench Book*, violated his Sixth Amendment right to counsel. We agree and reverse.

During the hearing on Wolf's motion to withdraw as counsel, the district court asked Johnson if he understood the ramifications of his decision to represent himself without

knowledge of the law, and Johnson acknowledged that he understood. But a review of the record indicates that the district court's questions do not reflect that the requirements of the Bench Book were met. The district judge commented that he had already "asked the United States taxpayers to pay for two of the finest lawyers in the district to represent [him]" and asked Johnson "[w]hy should we ask the United States taxpayers to appoint a third person." R. 46, Page ID #183–84. Shortly after these comments, Johnson expressed interest in representing myself.

> THE DEFENDANT: So here's my—here's my resolution, if Your Honor feels that these are two of the best appointed federal defenders we have in the Eastern Division, the northern—of Michigan, I'll represent myself. I can do a better job, with all due respect, Mr. Ludington, sir.
>
> THE COURT: Why—why do you think that without a legal education you are in a better position to make—make the decision that you are a better lawyer than either Mr. Wolf or Mr. Koelzer? I mean, doesn't that strike you as a little bit out there?
>
> THE DEFENDANT: Your Honor, it's not that I'm a better lawyer. I know my case, the ins and outs and legalities. I'm versed in Michigan court rule, MCL's, federal statutes, Federal Rules of Evidence. I didn't set—the time I did I didn't set idly on a bunk, just not studying. Trust me, I've studied. I'm college educated, as well, sir. I can articulate. I can move that jury. I can go in here and defend myself, and all these handwritten subpoenas and motions that I do have to file for Your Honor, I think you'll understand a little bit more. They're cited properly. There's Federal Rules of Evidence in support. And, no, I don't say that I'm a better lawyer. I'm sure these men have a lot more experience in a trial. It would be a David and Goliath, but I'm willing to take that opportunity. I'm willing to put my life on the line, so that's why I wrote the handwritten motion to you, sir. Because I can no longer go further and be compromised this way, when I know there's evidence out there that's time sensitive that proves my innocence. I am not lying to you, Mr. Ludington. I won't lie to you.
>
> . . .
>
> I'm conscious, so whatever Your Honor chooses today, I'll represent myself respectfully, sir.
>
> THE COURT: Well, let's talk about that. That's clearly an option going forward.
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: It's constitutionally protected—
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: —but it's not advisable, and it's for that reason that it's important that I be sure that you understand that.

*Id.*, Page ID #185-87.  Later, the district judge stated:

> THE COURT: . . . You're aware of the charges.  You're aware of the potential
> sentencing consequences, and you're aware of the fact that you're potentially
> engaging in an area where you don't have the expertise to evaluate all of the
> potential implications.  You understand that, right?
>
> THE DEFENDANT: I do, Your Honor.

*Id.*, Page ID #191.

The district court asked why Johnson thought he could adequately represent himself, and
Johnson acknowledged that he may not be able to but that he wanted to proceed *pro se* anyway.
The district court clarified counsel's role and asked Johnson if the limited scope of representation
was reasonable.  Johnson agreed that it was.  The district court judge then appointed a third
attorney, Crawford, to assist Johnson as standby counsel during trial.

The district court's *Faretta* inquiry falls far short of the inquiries approved by this Court
in other cases.  While in *United States v. Bankston*, 820 F.3d 215, 226 (6th Cir. 2016), we
concluded that the district court did not err when it did not ask four of the questions from the
model inquiry, we found that the *Faretta* inquiry was "substantially similar" to the model inquiry
approved in *McBride*, while acknowledging that *McBride* did not require "a precise accounting
of the questions asked."  *Id.* at 225.

We clarified, "[t]he critical question . . . is whether, in context, the questions asked by the
court meet the objectives of the model inquiry."  *Id.*  Thus, in *Bankston*, the district court's
inquiry met that standard because "the district court addressed the 'relevant considerations'—
including 'the defendant's familiarity with the law,' 'the gravity of the charges,' and 'the dangers
of self-representation,'—by asking a series of questions that were 'drawn from, or substantially
similar to,' the model inquiry questions."  *Id.* at 227 (internal citations omitted).

The inquiry in *Bankston* was far more searching than in this case.  There, the district
court inquired as to the defendant's education and familiarity with procedural rules, asked
whether she had previously represented herself in a criminal action, asked her to list the charges,
asked what her intended defenses were and how she intended to prove the defense, and explained
the limits on when she could consult with counsel during her trial.  *United States v. Bankston*,

No. 1:13-cr-00166-DCN (N.D. Ohio Nov. 17, 2014). The district court strongly admonished the defendant about the dangers of self-representation. *Id.* at 49. Further, the district court provided an example of how a prior defendant's decision to represent himself undermined his case. *Id.* at 49–50. Although the inquiry in *Bankston* did not mention the statutory maximum penalties, we noted that the district court discussed the statutory maximums the following day and prior to the trial. *Bankston*, 820 F.3d at 225.

Instead of confirming that Johnson knew the maximum potential sentences in his case, as required by the model inquiry, the district court downplayed his potential sentence. When Johnson noted that his previous counsel had told his mother that he could face "50 to 70 years" if he did not plead guilty, the district court responded: "This is not—this is not 50 to 70 years." R. 46, Page ID # 181. The range of 50 to 70 years of incarceration, however, was less than the maximum penalties that Johnson was actually facing—and ultimately Johnson was sentenced to 72 years. We find the district court's colloquy insufficient to comply with the requirements of the Bench Book.

We are likewise not convinced that Johnson waived his right to counsel through conduct toward his attorneys. It is true that if a defendant has fired multiple attorneys, he may lose his right to counsel. *United States v. Coles*, 695 F.3d 559, 560–62 (6th Cir. 2012). We have previously held that the defendant can knowingly, intelligently, and voluntarily waive his right to counsel when he makes demands for multiple counsel's dismissal and insists on proceeding *pro se*. *United States v. Green*, 388 F.3d 918, 921 (6th Cir. 2004).

In cases where we have affirmed a district court's determination that a defendant waived the right to counsel by conduct, the district court has made the basis for the waiver explicit. *See, e.g.*, *United States v. Pittman*, 816 F.3d 419, 422 (6th Cir. 2016) (determining at the hearing that "Pittman had 'effectively waived his right to counsel' by 'refus[ing] to cooperate with five lawyers'"); *Coles*, 695 F.3d at 561–62 (finding that the defendant exercised his right to represent himself when the defendant requested another attorney after the district court had previously warned the defendant that this was his last appointed attorney and that if he sought another attorney, then he would proceed *pro se*). The district court did not order Johnson to proceed *pro se* because of misconduct in either the hearing or in the subsequent order. As evident from the

record, Johnson was also amenable to counsel's representation when he agreed to having counsel as standby counsel. The record does not reflect that Johnson waived his right to counsel by dismissing his previous attorneys. We therefore find that Johnson did not knowingly, intelligently, and voluntarily waive his right to counsel and that the district court erred in allowing Johnson to proceed *pro se*.[2]

### III.

Johnson also asserts that the district court's finding that he did not submit a witness list violated his Fifth and Sixth Amendment rights.

A defendant's right to present his own witnesses to establish a defense constitutes a fundamental element of due process and is protected by the Compulsory Process Clause of the Sixth Amendment. *Washington v. Texas*, 388 U.S. 14, 19 (1967). To constitute a denial of the right to present a defense, a trial court's exclusion of evidence must "infringe[ ] upon a weighty interest of the accused." *United States v. Scheffer,* 523 U.S. 303, 308 (1998).

We review *de novo* whether the district court's evidentiary ruling violated Johnson's right to compulsory process and to present a defense under the Sixth Amendment. *United States v. Hardy*, 586 F.3d 1040, 1043 (6th Cir. 2009). We also review *de novo* whether an evidentiary ruling violated Johnson's due process right to present a defense under the Fifth Amendment. *United States v. Cunningham*, 679 F.3d 355, 374 (6th Cir. 2012).

It is true that Johnson failed to follow the proper procedures for securing the witnesses. He was, after all, proceeding *pro se*. During the pretrial conference, after asserting that he could represent himself, Johnson asked the court: "how do these subpoenas for evidence go? Will [counsel] have to file them or can I file them?" R. 46, Page ID # 192. The court clarified: "if you're going forward on your own, it'll be your responsibility." *Id.* at 193. Based on this, Johnson thought that sending the list to his attorneys and to the court was the correct way of submitting his witness list.

---

[2]Johnson also argues that the district court erred when it only mentioned that waiver of counsel "was knowing, intelligent, and voluntary," in a written order after the hearing. R. 39, Page ID # 136. We need not resolve this issue because we have already determined that the district court failed to conduct a proper *Faretta* inquiry.

Johnson argues that the district court should have allowed a continuance to secure witnesses. In *Bennett v. Scroggy*, 793 F.2d 772 (6th Cir. 1986), we granted habeas relief to a defendant whose request for a continuance was denied, in violation of the Sixth Amendment. However, there, the defendant had already issued a subpoena and was "diligent in interviewing [the witness] and procuring his presence," yet the witnesses did not appear in court. *Id.* at 775. This is distinguishable from the case at bar, where Johnson did not even subpoena the witnesses. Nor did Johnson request a continuance from the court.

It is true Johnson did not subpoena witnesses that would testify to his defense. However, given the confusion about his counsel's role, Johnson may have thought that the proper way to submit the witness list was to send it to his attorney, and he claimed that he submitted the list to his attorneys and to the court. During the trial, Johnson again mentioned to the court that he planned to call witnesses to testify. Johnson's standby counsel claimed that he was not aware of any witnesses. While the district court may not have made a blanket exclusion of defense witnesses, the court's conclusion that Johnson would not be able to timely procure witnesses the day of trial, especially without a subpoena, was based on insufficient review of the documents Johnson claims to have sent to the district court. The district court stated: "You are not going to have witnesses because you have not furnished the attorneys" a witness list. R. 100, Page ID # 755. However, when Johnson asked the court to review his letters, and the letters he had sent to counsel, the district court refused to do so. Johnson's counsel, Crawford, further admitted that he had not reviewed the dozens of letters that Johnson had sent to him. The district court prematurely concluded that Johnson had not submitted his witness list to his counsel and to the court. We therefore reverse on this ground, holding that the district court violated Johnson's right to compulsory process and to present a defense under the Sixth Amendment.

Lastly, Johnson asserts that the district court should have directed standby counsel to assist Johnson in issuing subpoenas to the witnesses. Appellant Br. at 25. As discussed above, the district court erred in allowing Johnson to proceed *pro se* without a complete Faretta inquiry. Stemming from that error, the district court likewise should have directed Johnson's counsel to file subpoenas and witness lists on Johnson's behalf.

## IV.

Next, Johnson challenges the district court's decision to allow two of Johnson's former partners to testify. He asserts that their testimony was inadmissible under Federal Rules of Evidence 403 and 404(b). Johnson states that the testimony was likewise inadmissible for rebuttal under Rules 404(a)(2) and 405 because character was not an essential element of the charges or the defense.

We review evidentiary issues for abuse of discretion, while acknowledging that there is an "on-going dispute in this circuit concerning the proper standard of review of Rule 404(b) evidence." *United States v. Carter*, 779 F.3d 623, 625 (6th Cir. 2015). We have previously reviewed prior bad acts for clear error; permissible purpose *de novo*; and probative value for an abuse of discretion. *See United States v. Mack*, 729 F.3d 594, 601 (6th Cir. 2013); *United States v. Clay*, 667 F.3d 689, 693 (6th Cir. 2012).

Prior to trial, the government submitted a notice of intent to offer the testimony of Johnson's two former partners about previous incidents of physical assault to show the absence of mistake or accident, and to show motive and intent under Rule 404(b). During the pre-trial conference addressing Wolf's motion to withdraw as counsel, Johnson explicitly stated "I have nothing to hide. Federal Rule of Evidence 404(b)'s filed by the Government, no objections." R. 46, Page ID # 192.

Later, during a motion hearing, however, Johnson clarified that he did not understand the nature of the evidence and had prematurely stated that he did not object to the former partner testimony and that he was "mistaken." R. 98, Page ID # 599. Subsequently, Johnson filed a "Motion to Deny Government's Notice of Intent" to offer evidence under 404(b). In his motion, he alleged that his former partners' claims were unsubstantiated and unproven but did not make legal arguments that would exclude the evidence under 404(b). Since Johnson was proceeding *pro se*, we construe his statements liberally and we hold that he did not waive his objection to the admission of testimony of his former partners. *United States v. Smotherman*, 838 F.3d 736, 739 (6th Cir. 2016).

Under Rule 404(b), evidence of other crimes or acts are not permissible to prove the character of the person. They may be admissible for other purposes, such as "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). This evidence still needs to be relevant and could be excluded if "probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. The list is not exhaustive, and the government may present another legitimate purpose. *United States v. Blakeney*, 942 F.2d 1001, 1018 (6th Cir. 1991).

In a pretrial order, the district court allowed the government to introduce the testimony of Johnson's prior partners "to establish intent and lack of accident if Defendant testifies and admits to committing the acts, or committing them in part, but denies that he intended to imprison or choke C.J." The district court, however, concluded that the government may not use the testimony to corroborate C.J.'s allegations because that would go to Johnson's propensity to commit the crime. Thus, the district court denied Johnson's motion to exclude the evidence and allowed the former partners to testify only to the limited bad acts that related in timing and circumstances to the one with C.J.

At trial, Johnson opened the door for this testimony to be used for impeachment purposes by stating "I've never . . . restrained a woman, kept them against their will. I've never choked a woman." R. 102, Page ID #1064. Under Rule 404(a)(2)(A), "a defendant may offer evidence of the defendant's pertinent [character] trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it." The government was then able to offer testimony from his former partners where one stated that she was held against her will and the other stated that she was choked. His former girlfriend testified that Johnson "strangled [her] and he barricaded [her] in [her] bedroom" for hours with "all the furniture up against the door." *Id.* at 1152. She also testified that Johnson "held [her] hostage in an abandoned home" and "forced [her] into a vehicle as he placed his hand on a hammer hatchet." *Id.* at 1153. Next, his former spouse testified that Johnson put his hands around her neck and headbutted her with full force. *Id.* at 1146.

Furthermore, the district court provided the jury with limiting instructions, stating that the testimony could be considered only as a rebuttal to Johnson's claim that he has never engaged in similar acts before. In a criminal case, if the defendant decides to offer evidence of a "pertinent

trait" "the prosecutor may offer evidence to rebut it[.]" Fed. R. Evid. 404(a)(2)(A). That is what took place here. By testifying that he had never restrained a woman, Johnson himself opened the door to a pertinent trait that he would never do a certain act.

Johnson's former partners' testimony was offered as impeachment evidence, rather than as evidence of his intent or lack of mistake. Johnson gave testimony that he had never choked or restrained a woman, and the witnesses' testimony was offered to rebut that statement. Even if the district court erred by permitting the government to introduce the two witnesses' testimony, any error was harmless. The government presented other testimony, as well as screenshots where he explicitly admitted to choking and hitting C.J. We cannot conclude that the verdict was "substantially swayed by [any] error," *United States v. Hardy*, 643 F.3d 143, 153 (6th Cir. 2011), and hold that the district court did not abuse its discretion in admitting the former partner testimony.

## V.

Lastly, Johnson challenges his sentence as being procedurally and substantively unreasonable.

In reviewing sentences for procedural reasonableness, we determine whether the district court "(1) properly calculated the applicable advisory Guidelines range; (2) considered the other § 3553(a) factors as well as the parties' arguments for a sentence outside the Guidelines range; and (3) adequately articulated its reasoning for imposing the particular sentence chosen, including any rejection of the parties' arguments for an outside-Guidelines sentence and any decision to deviate from the advisory Guidelines range." *United States v. Bolds*, 511 F.3d 568, 581 (6th Cir. 2007).

Substantive-reasonableness claims are reviewed for an abuse of discretion. A sentence is substantively reasonable if it is "proportionate to the seriousness of the circumstances of the offense and offender, and sufficient but not greater than necessary, to comply with the purposes" of the sentencing factors. *United States v. Vowell*, 516 F.3d 503, 512 (6th Cir. 2008) (internal quotations omitted) (quoting *United States v. Smith*, 505 F.3d 463, 470 (6th Cir. 2007)).

When considering substantive reasonableness, we take into account "the totality of the circumstances, including the extent of any variance from the Guidelines range . . . ." *Gall v. United States*, 552 U.S. 38, 51 (2007). "A claim that a sentence is substantively unreasonable is a claim that a sentence is too long (if a defendant appeals)," usually because the defendant believes that the district court placed too much weight on some of the § 3553(a) sentencing factors and too little on others. *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018).

A sentence "may be considered substantively unreasonable when the district court selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor." *United States v. Conatser*, 514 F.3d 508, 520 (6th Cir. 2008). The district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall*, 552 U.S. at 4950. Additionally, § 3553(a) requires courts to impose a sentence "sufficient, but not greater than necessary to comply with" the purposes outlined in 18 U.S.C. § 3553(a)(2). *Id.* at 50 n.6 (quoting § 3553(a)). The district court "must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Id.* at 50.

Here, Johnson argues that the district court erred in calculating his Guidelines range by determining that his offense of unlawful imprisonment under Mich. Comp. Laws § 750.349b was analogous to U.S.S.G. §2A4.1 for kidnapping, abduction, and unlawful restraint. Johnson failed to object to the application of §2A4.1 below and thus we review it for plain error. *See United States v. Vonner*, 516 F.3d 382, 385 (6th Cir. 2008) (en banc).

In *United States v. Epley*, 52 F.3d 571 (6th Cir. 1995), we affirmed the district court's decision not to apply the base offense level for unlawful restraint contained in U.S.S.G. § 2A4.1, as requested by the government. In *Epley*, the defendant police officers were convicted of conspiracy against rights, in violation of 18 U.S.C. § 241, and deprivation of rights under color of law, in violation 18 U.S.C. § 242, for planting drugs on a person to stage an arrest. *Id.* at 575. We considered whether the crimes contained in § 2A4.1 were analogous to Kentucky statutes that the defendants may have violated. *Id.* at 582. We noted that under Kentucky law, a person is guilty of false imprisonment in the first degree if "he knowingly and unlawfully restrains

another person under circumstances which expose that person to a risk of serious physical injury," Ky. Rev. Stat. § 509.020(1), and false imprisonment in the second degree if "he knowingly and unlawfully restrains another person," Ky. Rev. Stat. § 509.030(1). *See* 52 F.3d at 582. Although the defendants' conduct arguably met the requirements for false imprisonment in the second degree, we declined to apply the base level for unlawful restraint contained in § 2A4.1. *Id.* We reasoned that the "federal Sentencing Guidelines [did not] intend[] to sentence this misdemeanor offense as a level 24 crime," and that "elements of second degree unlawful imprisonment under Kentucky law are far less serious than the federal crimes sentenced under § 2A4.1." *Id.*

Johnson argues that, like in *Epley*, unlawful imprisonment in violation of Mich. Comp. L. § 750.349b is "less serious than the federal crimes covered under the guideline."[3] 52 F.3d at 582. Section 750.349b is not far less serious than the federal crimes charged under § 2A4.1. Section 750.349b is a felony that carries a maximum sentence of fifteen years of incarceration, whereas in *Epley*, the state statute was a misdemeanor. It cannot be said that the sentences would be vastly different, and that the state analogue would punish far less severely. We find the district court's choice of analogy to be reasonable and thus uphold it. *See United States v. Gibson*, 409 F.3d 325, 339 (6th Cir. 2005).

Johnson also challenges the Guidelines score for the eight counts of witness tampering, asserting that they should have been grouped together. Here, the U.S. Probation Office, in its PSR, calculated an offense level of 38, based on Johnson's career offender status and criminal history of VI. The PSR reflected a base offense level of 32, but U.S. Probation applied extra points for victim's bodily injuries, strangling of an intimate partner, and obstruction of justice, bringing the total to offense level 38. Pursuant to USSG §3D1.2(a), when counts involve the same victim and the same act or transaction, they are to be grouped together into a single Group. As such, the PSR grouped together the offenses that involved the same transaction, arising out of

---

[3]Johnson also characterizes *Epley* as "address[ing] whether § 2A4.1 was sufficiently analogous to Kentucky's near identical unlawful imprisonment statute." Def.'s Br. at 45 (comparing Mich. Comp. Laws § 750.349b and Ky. Rev. Stat. § 509.020(1)). Johnson's argument is misleading, however, as *Epley* determined that the defendant's conduct did not satisfy the elements of Kentucky's statute for false imprisonment in the first degree and thus, we did not consider whether § 2A4.1 was sufficiently analogous to it.

one event.  The remaining witness tampering counts were not grouped because those were separate instances when Johnson attempted to contact C.J. on various dates.  However, they were not counted as "standalone offenses" as Johnson suggests, but rather as enhancements, which added points to the overall base offense level.  The district court did not engage in impermissible double counting and did not err by not grouping the remaining witness tampering counts.  *See United States v. Pego*, 567 F. App'x 323, 330 (6th Cir. 2014).

Lastly, Johnson argues that the district court erred in not adequately applying the § 3553(a) factors when determining his sentence.  We agree and reverse on this ground.

> The district court's explanation for the sentence is as follows:
>
> THE COURT:  Thank you.  You've been confusing to me, Mr. Johnson, in the sense that, putting aside your behavior, you often appear to not be able to discern, as was explained earlier, what's in your best interest and what is not; and, as a result, you've ended up behaving in ways that didn't assist the presentation of your case under circumstances where you might have, but you made your own decisions.
>
> The second thing that I have observed, that I think is important here, is that I do not discern any sense of moral guardrails concerning your own behavior, none.
>
> THE DEFENDANT: I've been lied on.  Does that—does that come to any—
>
> THE COURT: <u>We've reviewed the Sentencing Reform Act, the guideline assessment outlined in the presentence investigation report, and I've also sought to briefly highlight, too, the important factors important to the Court in assessing the circumstance.</u>  Accordingly, we'd commit Mr. Johnson to the custody of the Bureau of Prisons for a term of 180 months with respect to Count One; 120 months for Count Two; 120 months for Count Three; 48 months for Count Four through Seven; 12 months for Count Eight; and 48 months for Count Nine through Thirteen, all consecutive for an aggregate total of 864 months.
>
> Upon his release from custody, if he so does, he's to be placed on supervised release for a term of three years for Counts One through Seven and Nine through Thirteen, and one year on Count Eight to run concurrently.

R. 104, Page ID #1267–68 (emphasis added).

The record does not reflect that the district court adequately considered the sentencing factors, merely stating that Johnson seemed to lack "any sense of moral guardrails."  *Id.* at 1260.

No. 19-2418        *United States v. Johnson*        Page 24

The brief reference to the PSR and the Sentencing Guidelines is insufficient to show full consideration by the court. *Id.* at 1255.

"While it is true that the district court is not required to explicitly go through each sentencing factor, the district court is required to provide this Court with some evidence on the record that the § 3553(a) factors were considered." *United States v. Johnson*, 467 F.3d 559, 563 (6th Cir. 2006). In *Johnson*, the panel determined that the district court erred by failing to provide any indication that it considered the § 3553(a) factors, instead focusing solely on the guidelines range. *Id.* at 563–64. Further, the panel determined that this error was not harmless. *Id.* at 564–66. The panel emphasized that the defendant's sentencing hearing was "notably devoid of *any* consideration of factors such as Defendant's personal history, the nature of his offense, or the need for the sentence to deter Defendant or others from future like crimes." *Id.* at 566.

There is no evidence on the record here that the district court considered the § 3553(a) factors, as reflected in the lack of articulate reasoning for imposing the particular sentence. *See Bolds*, 511 F.3d at 581. Further, the district court did not address Crawford's argument that Johnson could rehabilitate with decades of mental-health treatment. In *United States v. Wallace*, 597 F.3d 794, 802 (6th Cir. 2010), we concluded that the district court had erred by failing to acknowledge the defendant's argument that her sentence was disproportionate to her more culpable co-defendant's sentence, or to explain why the district court imposed a longer sentence. *Id.* at 805. The government contends that the district court considered this argument because it included significant mental-health components in conditions of his supervised release. Gov't Br. at 60. However, the district court's inclusion of mental health treatment as a condition of supervised release is insignificant because the district court understood that it was imposing an effective life sentence. *See* R. 104, Page ID # 1268 ("Upon his release from custody, if he so does, . . .").

For these reasons, we conclude that Johnson's sentence is procedurally unreasonable. For similar reasons, because the record does not show which of the sentencing factors the district court considered during sentencing, and whether more weight was given to one factor or another,

we conclude that the sentence is substantively unreasonable.  We therefore hold that the district court committed plain error in sentencing Johnson to 864 months of imprisonment.

## VI.

On remand, we order this case be reassigned to another district court judge for a new trial.  We have a duty to supervise district courts to ensure "proper judicial administration in the federal system."  *La Buy v. Howes Leather Co.*, 352 U.S. 249, 259–60 (1957); *Rorrer v. City of Stow,* 743 F.3d 1025, 1049 (6th Cir. 2014).  Because reassignment is an extraordinary decision, we consider the following factors:

> (1) whether the original judge would reasonably be expected to have substantial difficulty in putting out of his or her mind previously expressed views or findings;
>
> (2) whether reassignment is advisable to preserve the appearance of justice; and
>
> (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*Solomon v. United States,* 467 F.3d 928, 935 (6th Cir. 2006).  Here, the record reflects that the district judge was affected by Johnson's outbursts and behavior.  We are uncertain that the judge could "put out of his mind" his previous views or findings.  Given the serious errors at trial and sentencing, such reassignment would serve to preserve the appearance of justice.  Lastly, because the case is remanded for a new trial, reassignment would not result in waste or duplication. Accordingly, we hold that reassignment is warranted.

## VII.

For the foregoing reasons, we **REVERSE** Johnson's conviction and sentence and **REMAND** the case for reassignment to a different district judge and a new trial.

_____

**DISSENT**

_____

SILER, Circuit Judge, dissenting. I would affirm the district court for the reasons stated herein.

On the first issue raised, the district court did not err in allowing Johnson to represent himself for a period in the trial, based upon the decision from *Faretta v. California*, 422 U.S. 806, 819 (1975). Certainly, the district court did not conduct a colloquy with Johnson verbatim with the Bench Book, as recited in *United States v. Bankston*, 820 F.3d 215, 226 (6th Cir. 2016), but it did question Johnson about his experience in a trial and advised him of the penalties, although they were less than what the court explained. When Johnson inquired about the maximum potential sentences, the court advised that it was not 50 to 70 years as Johnson had been told by his mother. That figure was actually less than the maximum penalty that Johnson faced and was less than the 72 years he eventually received. Nevertheless, I believe that Johnson effectively waived his right to counsel through his misconduct toward his court-appointed attorneys. The district court did not make a finding of a waiver, but we have previously found that a defendant's "persistent, unreasonable demand for dismissal of counsel and appointment of new counsel function[s] as a valid waiver of the right to counsel." *United States v. Green*, 388 F.3d 918, 922 (6th Cir. 2004). Johnson refused to cooperate with his appointed counsel in his defense and accused them of colluding with the prosecution against him. His conduct rose to a threat to the personal safety of his attorneys. His second appointed attorney, Wolf, stated that at an earlier meeting, Johnson became so enraged that three security officers had to leave the control booth and come out to make certain that Wolf was not under physical assault. Therefore, I think that Johnson waived his right to counsel through his own misconduct, even if not declared such by the court.

I also disagree with the majority's conclusion that Johnson was denied his right to compulsory process and to present a defense under the Sixth Amendment. This is based on the fact that Johnson wanted certain witnesses to be called on his behalf. There is no question that there seemed to be a bit of confusion as to whether Johnson or his stand-by counsel had

requested the appearance of the witnesses or issued subpoenas for them. However, there is a gap in the record that precludes this conclusion that he was denied the right to call his witnesses. Most of the witnesses Johnson indicated that he might call were related to him. The only witnesses that might have been called were revealed during voir dire by Johnson's counsel. They included his cousins, Ashley Mazur and Billie Jo Mazur; FBI agent, Steven Larsen; the victim, C.J.; Johnson's mother, Robin Johnson; his aunt, Kelly Mazur; and his daughter's mother, Brandy Kenyon. The defense was able to cross-examine C.J. and the case agent. Because the rest were relatives, Johnson never seriously argued that he needed subpoenas to secure the presence of his family members. After Johnson testified, when the district court asked stand-by counsel Crawford whether he had any additional witnesses to call, Crawford replied in the negative and said that the defense was resting. No motion was made for a recess in order to call witnesses. Johnson's mother was on the government's witness list, so she was always available. Finally, Johnson never has shown by proffer or affidavit what he expected these potential witnesses to have testified about. It would be a strange outcome if our court reversed the case based upon the absence of witnesses who knew nothing about the crime. This might be a valid issue to bring up in a motion to vacate, but the record is blank on what the witnesses would have said and whether the stand-by counsel or Johnson himself knew what beneficial testimony any of the witnesses could have produced.

On the sentence, the majority criticizes the district court for an insufficient application of the § 3553(a) factors. However, as the majority indicates, the district court said that it was considering those factors. Johnson agreed to a within-guideline sentence, which was granted. The court indicated that it had "reviewed the Sentencing Reform Act" and the presentence investigation report. We have previously approved sentencing colloquies that are "clearly not … model pronouncement[s]." *United States v. Zazueta-Garcia*, 239 F. App'x 941, 950 (6th Cir. 2007). I would find that the sentence was not procedurally or substantially unreasonable. Moreover, if this case is remanded, I would not reassign it to a different judge. I do not find reversible error committed by the judge in this case. He would be more acquainted with the record and could expedite the trial if required. Reassignment is an extraordinary power that should be rarely invoked. *See U.S. ex rel. Williams v. Renal Care Grp., Inc.*, 696 F.3d 518, 533 (6th Cir. 2012). Therefore, I would affirm the judgment of the district court.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 19-2418

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

    v.

MICHAEL LEE JOHNSON,

    Defendant - Appellant.

> **FILED**
> Jan 31, 2022
> DEBORAH S. HUNT, Clerk

Before:  SILER, MOORE, and DONALD, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court for the Eastern District of Michigan at Bay City.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is REVERSED and REMANDED for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

_____

Deborah S. Hunt, Clerk